UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Wade A. Thalberg,

           Plaintiff,

   vs.                        REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

           Defendant.        Civ. No. 05-2950 (JMR/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB"). The matter is now before the Court upon the parties' cross-Motions

for Summary Judgment. The Plaintiff has appeared by John H. Burns, Esq., and the

Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney. For

reasons which follow, we recommend that the Plaintiff's Motion for Summary

Judgment be denied, that the Defendant's Motion be denied, and that the matter be remanded to the Commissioner for further proceedings consistent with this Report.

## II. Procedural History

The Plaintiff first applied for DIB on June 20, 2003, [T. 74-76], at which time, he alleged that he had become disabled on May 21, 2002. [T. 74, 134]. He was insured through December 31, 2006. [T. 20]. The State Agency denied his claim on initial review, [T. 46-50], and upon reconsideration. [T. 55-57]. The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on March 22, 2005, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by an attorney. [T. 344-97]. Thereafter, on June 23, 2005, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 19-31]. On June 29, 2005, the Plaintiff requested an Administrative Review before the Appeals Council, and submitted additional evidence for the Council's review. [T. 11-15; 333-343]. On October 28, 2005, the Appeals Council denied the Plaintiff's request for review. [T. 6-8]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §404.981.

III.  Administrative Record

A.   Factual Background.  The Plaintiff was twenty-six (26) years old when he applied for DIB, and twenty-nine (29) years old when the ALJ issued his decision, on June 23, 2005.  [T. 30].  He is right-handed, [T. 168], has an eleventh or twelfth grade education, and was trained as a motorcycle mechanic.  [T. 30, 139, 349].  The Plaintiff has work experience running his own tool sales business, and working as a bowling alley manager, and motorcycle mechanic.  [T. 29, 76, 135, 142, 356].  He last worked as a tool salesman on May 21, 2002.  [T. 135].  The Plaintiff is married, has no children, and he lived with his wife until January of 2005, when they separated. [T. 74, 119, 144].  The Plaintiff alleges that he could not work from May 21, 2002, until August of 2004, because he was disabled by non-epileptic seizures ("NES").  [T. 60, 135, 352].

1.    Medical History Included in the Record.  Treatment notes from Woodland Centers reveal that the Plaintiff presented for depression on May 2, 2002, and reported that he had been experiencing suicidal ideation, and an inability to go to work, for the previous two (2) months.  [T. 208].  The Plaintiff told his therapist that his depression stemmed, in part, from financial worries.  [T. 207].  He was referred

to a one (1) to two (2) week Partial Hospital Program, and was discharged with a prescription for Effexor.[1]  [T. 204-205].

On May 21, 2002, the Plaintiff was involved in a one-vehicle automobile accident.  [T. 197-98].  At that time, he was evaluated for head and neck injuries, and a CT scan of the Plaintiff's head was performed, which did not reveal any abnormalities.  [T. 198].  A week after the accident, the Plaintiff was seen by his physician, Dr. Patrick J. Hanna, complaining of neck soreness, and was diagnosed with a sprain.  [T. 227-28].

On June 11, 2002, the Plaintiff told his physician that he had experienced several black out spells in the past four (4) to five (5) days, along with an increase in headaches.  [T. 227].  The attending physician told the Plaintiff to report any further blackout episodes. [T. 226].

On July 1, 2002, the Plaintiff was brought to the emergency room by his wife, when she found him incoherent and unable to speak.  [T. 146].  His wife stated that, since the Plaintiff's automobile accident, he has had problems with right side weakness, and an examination revealed that he had diminished right-sided hand grasp.

---

[1]Effexor "is indicated for the treatment of major depressive disorder." Physicians' Desk Reference, at p. 3412 (61st ed. 2007).

[T. 148-49].  The Plaintiff was diagnosed with expressive aphasia and a seizure disorder, and the attending physicians performed a lumbar puncture.  [T. 146].  A CT scan was also performed, and revealed no abnormalities.  [T. 150].  The attending neurologist felt that the Plaintiff's seizures might be due to a subtherapeutic dose of Dilantin,[2] and his dosage of that drug was increased.  [T. 146].  The Plaintiff also underwent an MRI of his thoracic spine, which revealed a mild herniated disc, that was treated with an epidural steroid injection.  Id.   The Plaintiff reported another seizure on July 11, 2002, that was not observed by anyone.  [T. 225].

The Plaintiff's seizures gave rise to interruptions in his normal speech patterns, and the Plaintiff began speech therapy, as an inpatient in July of 2002, and he continued speech therapy, on an outpatient basis, until December of 2002.  [T. 157].  During that time, the Plaintiff attended speech therapy three (3) to five (5) times a week, although he cancelled approximately once a week because of headaches.  [T. 152-54].  An assessment on July 22, 2002, found that the Plaintiff demonstrated a "severe communication deficit," and suggested a diagnosis that combined motor

---

[2]Dilantin is a trademark for a preparation of phenytoin, which is "an anticonvulsant and cardiac depressant used in the treatment of all forms of epilepsy except petit mal."  Dorland's Illustrated Medical Dictionary, pp. 502, 1374 (29th ed. 2000).

aphasia and verbal apraxia. [T. 158]. The Plaintiff's speech pathologist observed that the nature of the Plaintiff's communication deficits frequently changed from session to session. [T. 157]. The Plaintiff was discharged from speech therapy in December of 2002, and the speech therapist noted that he had made significant improvement, but that the Plaintiff continued to show a level of impairment from verbal apraxia, and experienced increased problems with all forms of speech, when he reported headaches. [T. 152-54].

The Plaintiff continued to see Dr. Hanna for periodic check-ups. On November 8, 2002, the Plaintiff complained of headaches, that were relieved by Tylenol, and reported that his last seizure occurred in August of 2002. [T. 223]. However, on November 22, 2002, the Plaintiff reported that he had been taken off Dilantin, and was having seizures twice daily. Id. When the Plaintiff saw Dr. Hanna, in December of 2002, he was still reporting an average of two (2) seizures daily, and he mentioned that he was seeking a second opinion, after a psychologist at the University of Minnesota had suggested that he was "faking" his symptoms. [T. 222].

The Plaintiff was examined by Dr. Daniel Randa, in January of 2003, who noted that the Plaintiff reported experiencing one (1) to two (2) blackout episodes daily. [T. 161]. Dr. Randa also observed that, when the Plaintiff had previously been

seen at the University of Minnesota, he had two (2) "spells" while on video EEG, but that no abnormal brain activity had been observed.  Id.  The Plaintiff explained that his blackouts began with a feeling of lightheadedness, followed by numbness in his left scalp, then a loss of consciousness, and a shaking in his extremities, followed, in turn, by a period of lethargy, with a need for one (1) to two (2) hours of sleep.  Id.  Dr. Randa recounted the results of numerous diagnostic tests, which were previously performed on the Plaintiff, including CT scans, MRI studies and EEGs, that were all normal, and showed no abnormal electrical activity in the Plaintiff's brain.  [T. 161-62].  Dr. Randa further noted that the Plaintiff's speech problems, and blackout spells, were felt to be "emotionally based," but that, when the Plaintiff's Dilantin was discontinued, he began having seizures at a rate of one (1) to two (2) per day.  Id.

Dr. Randa considered the assessment and testing of the Plaintiff, that had been performed at the University of Minnesota, and found that, although the Plaintiff had exhibited considerable speech problems, the work-up was negative, and psychometric tests of the Plaintiff showed "considerable inconsistencies."  Id.  Dr. Randa also quoted from Dr. Sullivan's evaluation of the Plaintiff, from September 10, 2002, which stated as follows:

> Inconsistency suggestive of hidden agenda, e.g., to present himself in a certain way. [The Plaintiff] attempted to do this in violation of task instructions without actually appearing downright uncooperative. Lack of a consistent cohesive pattern with deficits across tasks was an undeniable indicator that he is not suffering from true aphasia. The psychiatric history is remarkable for depression and behavior problems. A previous bout of depression requiring hospitalization in a partial psychiatric inpatient program one month before the accident is noted. Psychiatric problems preceded the accident in question.

[T. 162].

Dr. Randa's neurological examination of the Plaintiff was unremarkable, and he found the Plaintiff to be alert, pleasant, oriented, and cooperative. [T. 162].

Dr. Randa also found that the Plaintiff demonstrated normal speech fluency and comprehension, with no aphasic elements, and with an intact memory. Id. Dr. Randa concluded that the etiology of the Plaintiff's episodic loss of consciousness was unclear, but that normal EEG monitoring suggested NES, and he further observed that, while the Plaintiff's speech disturbance might be non-organic in origin, frontal lobe seizures could be bizarre, but should still be considered in the Plaintiff's diagnosis, despite the video EEG results. [T. 163]. Dr. Randa found the Plaintiff's speech disturbance to be "somewhat puzzling," and he recommended further testing, and

concluded by referring the Plaintiff to Dr. John Gates, an expert in differentiating atypical seizure patterns from NES.  Id.

Dr. Gates saw the Plaintiff on January 14, 2003, and administered a twenty-four (24) hour video monitoring and EEG, that captured four (4) events of varying degrees of severity, which lasted from twenty (20) seconds to two (2) minutes.  [T. 164].  At the time of his visit, the Plaintiff reported that he was having one (1) or two (2) seizures per day.  [T. 168].  Tests revealed that the seizures, which were recorded on the video EEG, were non-epileptic in nature, and Dr. Gates noted that the Plaintiff, and his wife, appeared to be relieved by that diagnosis.  [T. 164].  Dr. Gates also performed a Personality Assessment Inventory ("PAI") on the Plaintiff, which revealed a profile consistent with a diagnosis of psychogenic NES.  Id.

A neuropsychological evaluation of the Plaintiff, which was conducted by Dr. Gates at the same time, found that the Plaintiff fell within normal limits, and demonstrated modest to marked improvement, when compared to results from a neuropsychological exam that was conducted in September of 2002.  Id.  Dr. Gates concluded, that the Plaintiff's scores on the Victoria Symptom Validity Test ("VSVT"), suggested less than adequate effort, while the results from the Test of Memory Malingering ("TOMM") were unremarkable.  [T. 165].  Dr. Gates opined

- 9 -

that the "lack of a consistent cohesive pattern with deficits across tasks, was an undeniable indicator that [the Plaintiff] is not suffering from true aphasia," and he took notice of the Plaintiff's history of depression and behavioral problems, that required hospitalization.  Id.  Dr. Gates discharged the Plaintiff with a diagnosis of NES, and conversion disorder versus malingering versus factitious disorder. [T. 165].

Dr. Gates concluded by noting that the Plaintiff was involved in litigation, and "because of the somewhat inconsistent and bizarre presentation on neuropsychological testing along with his psychological profile," he felt it was not possible to distinguish between a conversion disorder, malingering, and factitious disorder, but noted that the Plaintiff was "quite invested" in the diagnosis of NES.  [T. 166].  Dr. Gates also recorded that the Plaintiff was "desperately seeking answers as to the cause of these events."  [T. 170].  Dr. Gates recommended that the Plaintiff continue to work with his therapist, [T. 164], and not drive, or operate hazardous machinery.  [T. 165].

Concurrent with his hospital evaluation by Dr. Gates in January of 2003, the Plaintiff was also evaluated by Dr. Robert Doss.  [T. 182-84].  Dr. Doss noted that the Plaintiff was "forthright, honest, and able to admit to minor shortcomings."  [T. 181]. In his evaluation, Dr. Doss found that the Plaintiff had developed a very unusual language disorder, in July of 2002, along with his seizure disorder, [T. 184], but that

the Plaintiff exhibited dramatically improved speech, and language ability, when compared with prior testing from September of 2002. [T. 182]. However, Dr. Doss questioned the results of the most recent tests, because of the Plaintiff's response to validity testing, which suggested an exaggeration of deficits, or at least a poor effort on the part of the Plaintiff, and also revealed a "very atypical" performance, that did not conform to any known pattern of brain dysfunction. Id.

Dr. Doss performed several tests on the Plaintiff, including a Personality Assessment Inventory ("PAI"), and found that the Plaintiff exhibited antisocial personality characteristics, somatic complaints, mild depression, and cognitive complaints, which were consistent with his past psychiatric history, and with a diagnosis of psychogenic NES. [T. 181]. Dr. Doss reported that, while the Plaintiff's TOMM performance was within normal limits, his performance on the VSVT suggested possible symptom exaggeration, or at least inadequate effort. [T. 182]. Dr. Doss also determined that the Plaintiff's test results were not inconsistent with Dr. Sullivan's prior conclusion, that psychiatric and/or motivational factors were probably contributing to the Plaintiff's symptoms. Id. Dr. Doss suggested diagnoses of conversion disorder, factitious disorder, or malingering, and noted that consideration

should be given to the Plaintiff's motive to maintain his sick role and/or disability status for financial reasons.  Id.

In March of 2003, the Plaintiff reported to Dr. Gates for a follow up examination, at which time, he stated that he continued to have seizures about once every other day, and was seeing a social worker who recommended that he see a doctor who specialized in conversion disorder.  [T. 180, 188].  Also, in March of 2003, Dr. Hanna re-evaluated the Plaintiff's speech, and found that it was nearly normal. [T. 222].  On May 23, 2003, the Plaintiff was given the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") by Dr. Steven Thurber. [T. 256-57].

Dr. Thurber observed that the Plaintiff responded to the questions in the MMPI-2 in an "honest, forthright manner," which suggested that his self-report was trustworthy.  Id.  The test results were consistent with a tendency to substitute somatic complaints for anxiety, and depression, when under stressful conditions.  Id.  Dr. Thurber noted that previous medical tests had failed to discover an organic basis for the Plaintiff's NES, and that the results of the Plaintiff's MMPI-2 were consistent with a psychogenic origin for the Plaintiff's seizures, which were probably caused by stress, combined with affective conditions.  Id.  Dr. Thurber found "no intention to distort or manipulate" the test results by the Plaintiff. [T. 257].  Dr. Thurber concluded

that one explanation for the Plaintiff's symptoms was that he had suffered from genuine, organic seizures following the accident, which were associated with negative affectivity and stress, and that the organic problem dissipated, leaving the associated psychological features to acts as eliciting stimuli.  Id.

On June 23, 2003, the Plaintiff was again seen by Dr. Gates for a follow up visit.  [T. 177-78].  The Plaintiff told Dr. Gates that his seizures had decreased in frequency since his last visit in March of 2003, and that he was having one (1) or two (2) seizures a week, and then, would not have a seizure for a couple of weeks.  Id.  Dr. Gates noted that the Plaintiff continued to received considerable benefits from counseling, and that the Plaintiff exercised regularly, and was generally healthy.  Id.  At that time, the Plaintiff was taking Effexor, Lexapro,[3] and Trazodone,[4] and complained of no side effects to those medications.  Id.  Dr. Gates recommended that the Plaintiff continue counseling, since it appeared to be working well for him, and he scheduled a follow up in six (6) months.  [T. 177].

---

[3]Lexapro is "indicated for the treatment of major depressive disorder." Physicians' Desk Reference, at p. 1194 (60th ed. 2006).

[4]Trazodone hydrochloride is "an antidepressant used to treat major depressive episodes with or without persistent anxiety."   Dorland's Illustrated Medical Dictionary, p. 1868 (29th ed. 2000).

Dr. Randa also saw the Plaintiff in July of 2003, for a neurological assessment, and noted that the Plaintiff reported having one (1) seizure a week, and that the Plaintiff understood that his seizures were related to stress and anxiety.  [T. 187].  Dr. Randa expressed his hope that the Plaintiff's spells would gradually dissipate over time. [T. 188].

On August 28, 2003, the Plaintiff was seen for a deep cut on his face, resulting from a fall during a seizure, that required stitches on his forehead and cheek.  [T. 125].  At that time, the Plaintiff reported having seizures approximately once a week. [T. 193].  Therapy notes from September of 2003, reveal that the Plaintiff was seeking to return to work, and responded positively to his counselor's suggestion that his seizures could be partially caused by repressed fear and stress resulting from his accident.  [T. 201].  In February of 2004, the Plaintiff's therapist noted that the Plaintiff was having increased anxiety about being in public, because of his fear of having a seizure, but that the Plaintiff also reported being increasingly aware of the precursor symptoms to a seizure, and was able to get to a safe place before it started. [T. 273].

When Dr. Gates saw the Plaintiff on July 14, 2004, the Plaintiff reported that he experienced a seizure approximately every two (2) to three (3) weeks, that was preceded by an aura.  [T. 258].  Dr. Gates noted that the Plaintiff was taking Lexapro,

Trazodone, and Provigil,[5] and reported no side effects from any of those medications. [T. 258-59]. Therapy notes from September of 2004, include a notation that the Plaintiff reported having approximately one (1) seizure every two (2) to three (3) weeks, although, in August of 2004, he reported that he had gone four (4) weeks without having any seizures. [T. 264, 267].

The Plaintiff was seen on February 3, 2005, by Dr. El-Hadi Mouderres, and reported that he and his wife had separated, but that the stress of separation had not precipitated any new seizures. [T. 286]. At the time of the visit, the Plaintiff reported that he had been seizure-free for approximately five (5) months. Id.

2. Statements by Treating Physicians in the Record. Several of the Plaintiff's physicians submitted letters, that were included in the Record considered by the ALJ, and that commented on the Plaintiff's ability to work during the relevant period from May 21, 2002, until August of 2004. Dr. Gates submitted a letter dated December 15, 2003, which stated that the Plaintiff's diagnosis of NES was "a legitimate medical diagnosis," and that, as of the date of the letter, the Plaintiff's seizures continued to occur every one (1) to two (2) weeks, and rendered it impossible

---

[5]Provigil is "a wakefulness-promoting agent." Physicians' Desk Reference, at p. 1002 (60th ed. 2006).

for him to drive.  [T. 253].  Dr. Gates concluded that these events could be stopped

with continued therapy, but that, at that time, he felt that the Plaintiff was not able to

work.  Id. Dr. Gates also submitted answers to a questionnaire, dated March 16, 2005,

in which the physician affirmed his prior opinion that the Plaintiff would not have

been capable of full-time, competitive work during the relevant period.  [T. 306-07].

Tim Lucas ("Lucas"), who was the Plaintiff's social worker, submitted a letter,

dated December 17, 2003, in which he concluded that the Plaintiff was not able to

work because of his seizures, and that testing suggested the seizures became more

frequent when he was under stress. [T. 254].  Lucas also responded to a questionnaire

from the State Agency, in March of 2005, that asked him to evaluate the combined

effects of all of the Plaintiff's mental health impairments on his ability to perform full-

time work, from May of 2002, through August of 2004.  [T. 284].  Lucas responded

that the Plaintiff would have required three (3) or more days per month off of work

due to his impairments, and therefore, would not have been able to work a full day in

a competitive work environment.  [T. 284-85].

Dr. Vomacka, who was the Plaintiff's treating psychiatrist, also submitted a

letter, dated March 11, 2005, in which she reported that she treated the Plaintiff from

May 21, 2002, through August 20, 2004, and opined that he should not have been

employed in that period.  [T. 305].  Dr. Vomacka added that the Plaintiff had been "very compliant" with his medication management and psychiatric follow up, as well as in his individual therapy appointments.  Id.

A letter from Dr. Hanna, dated December 18, 2003, noted that the Plaintiff did not work from May 21, 2002, until July of 2003, at his recommendation.  [T. 255]. On March 16, 2005, Dr. Hanna also submitted a State Agency questionnaire, which affirmed his prior opinion, that it would have been unlikely that the Plaintiff could have performed gainful work for a six (6) to eight (8) hour workday, due to his impairments. [T. 308-09].

3.      Lay Testimony in the Record.  In addition to statements submitted by the Plaintiff's treating physicians, the Record also contains the statement of the Plaintiff's employer, and the results of an Activities of Daily Living ("ADL") questionnaire that had been completed by the Plaintiff.  The Plaintiff began working at a Sears store, in Montevideo, Minnesota, starting in May of 2004.  [T. 143]. On March 18, 2005, Ann M. Ackerman, the co-owner of the Sears store, submitted a statement in which she stated that the Plaintiff did not have any seizures on the job until October of 2004, when he had a seizure that required him to leave work.  Id. According to Ackerman, on the day of the seizure, the Plaintiff complained that he

was not feeling well and had a bad headache, and then sat in a chair and developed a blank stare, followed by fifteen (15) seconds of convulsions.  Id.  Ackerman noted that, after the seizure, the Plaintiff fell into a deep sleep and, when he regained consciousness, his speech was severely impaired, and scarcely intelligible.  Id. Ackerman added that she recalled the Plaintiff missing work about six (6) to eight (8) times because he had a seizure during non-work hours and needed to recover.  Id.

The Plaintiff filled out an ADL questionnaire on July 1, 2003, in which he was asked to describe his limitations during the period from May 1, 2001, through July of 2003.  [T. 118].  The Plaintiff reported that he had no problem maintaining his personal hygiene, and described a typical day as one involving exercising, cleaning his house, working around the house, preparing meals, and watching television.  Id. The Plaintiff noted that he could cook, clean, perform housework, and do laundry, with no problems, and could also shop, do yard work, make household repairs, or remove snow, but that he preferred to be accompanied on the latter tasks in case he had a seizure.  [T. 119].  The Plaintiff noted that he was no longer able to drive, which limited his ability to travel alone to appointments outside of the house.  Id.

For hobbies, the Plaintiff reported exercising on a treadmill and performing resistance training, as well as doing yard work, and remodeling his house.  Id.  The

Plaintiff also stated that he saw friends and family, and noted no difficulties in visiting with them socially, and doing "normal family activities." [T. 120]. He also reported going out in public several times a week for short periods. Id. The Plaintiff commented that he could not use power tools, drive a car, or ride a bicycle, because of the risk of seizures, and added that he sometimes had difficulty concentrating when he was reading. [T. 122]. The Plaintiff listed, as his only major stressor, the fear of a recurrence of his seizures. Id. He suggested that he had been looking for work, and was considering online education programs so as to train for a new job if his seizures eventually subsided. [T. 123].

4.    Evidence Submitted after the Hearing. At the end of the Hearing, the ALJ left the Record open for the Plaintiff to submit additional materials relating to his DIB claim. [T. 396]. The Plaintiff submitted copies of pay stubs from the Plaintiff's employer, for the period from June of 2004, through December of 2004. [T. 88-103].

The Plaintiff also submitted a statement from his wife, Kari Thalberg ("Thalberg"), in which she claimed that, between May of 2002, and January of 2005, she saw the Plaintiff have approximately one hundred (100) seizures that varied in intensity from mild to severe. [T. 144]. Thalberg opined that, while she had no way

- 19 -

of knowing the source of the seizures, she had no doubt that they were real, and not intentionally contrived.  Id.  According to Thalberg, at the time the Plaintiff was having the most of his seizures, he had them at a rate of more than once a day, and they ranged in intensity from an unresponsive state, to more serious seizures involving convulsions, followed by ten (10) minutes of unconsciousness.  Id.  After his seizures, Thalberg noted that the Plaintiff would have a bad headache and be very tired, requiring sleep for at least two (2) hours.  Id.  Thalberg also noted that the seizures restricted the Plaintiff's activities, rendering him unable to drive a car, operate his business, use tools, do laundry, or work outdoors unsupervised.  Id.  According to Thalberg, the seizures also had a major impact on the Plaintiff's social life, as he became reluctant to go anywhere with groups of people -- to church, to family gatherings, or to social events -- and was unable to ride a motorcycle, attend car races, or continue remodeling the family home.  [T. 144-45].

     5.   Evidence Submitted to the Appeals Council.  After the ALJ issued his decision, the Plaintiff submitted additional evidence for consideration by the Appeals Council.  [T. 333-43].  In an opinion dated September 30, 2005, Dr. Hanna confirmed that he diagnosed the Plaintiff with NES, and opined that the Plaintiff was credible in his description of his symptoms.  [T. 333].

B.    <u>Hearing Testimony</u>.  The Hearing, on March 22, 2005, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record, and stated that a Medical Examiner ("ME") was also scheduled to be in attendance, but was not present.  [T. 346].  The ALJ noted that he had not been involved in any prior determination made in the Plaintiff's application for DIB.  <u>Id.</u>  The ALJ then asked the Plaintiff's attorney if he had any objections to any of the evidence being introduced into the Record, and the Plaintiff's attorney stated that he did not.  [T. 347].  The Plaintiff's attorney made an opening statement in which he stated that, if the ME were present, he would testify that the Plaintiff met the listing under 12.07, for a somatoform disorder, or for an epileptic condition under 11.02 and 11.03.[6]  [T. 347-48].

The ALJ then swore the Plaintiff to testify, and began by asking him preliminary questions about his name and social security number.  <u>Id.</u>  The Plaintiff stated that he was born on July 4, 1975, and was twenty-nine (29) years old at the time of the Hearing.  <u>Id.</u>  The ALJ asked the Plaintiff about his living situation, and he

---

[6]A somatoform disorder is a mental impairment which is characterized by symptoms that are suggestive of a physical disorder, but which are actually of a psychogenic origin, and which are not under voluntary control.  <u>Dorland's Illustrated Medical Dictionary</u>, p. 532 (29th Ed. 2000).

replied that he had been separated from his wife for approximately two and one-half (2 ½) months.  [T. 348-49].  The Plaintiff testified that he lived alone in a house, where he had lived for the past seven (7) years.  [T. 349].  The ALJ next asked the Plaintiff about his educational background, and the Plaintiff stated that he completed eleventh grade, but did not earn a GED, and then attended a year of vocational school, at the Motorcycle Mechanics Institute, in Phoenix, Arizona.  Id.  The Plaintiff testified that he completed his vocational training in September of 1994, and earned several certificates for various types of motorcycle repair.  Id.  The Plaintiff stated that he had no trouble reading or writing, and that he maintained a personal checking account that he balanced himself.  [T. 349-50].  The Plaintiff described himself as approximately 5"8" or 5'9" tall, right-handed, and weighing 186 pounds, which he considered to be his normal weight.  [T. 350].

Next, the ALJ asked the Plaintiff why he believed that he was unable to work. Id.  The Plaintiff testified that he had been diagnosed with "pseudo seizures," or psychogenic seizures, and had seen several specialists in an attempt to get his symptoms under control.  Id.  According to the Plaintiff, all of the specialists that he saw advised him that it would not be to his benefit to work, as the seizures happened frequently, sometimes several times a day.  Id.  The Plaintiff testified that stress made

his seizures worse.  Id.  The ALJ then asked the Plaintiff about his recent work at Sears, in Montevideo, Minnesota.  Id.  The Plaintiff noted that he had started working at Sears in June of 2004, as a sales and delivery person, and continued to be employed there at the time of the Hearing.  [T. 350-51].  The Plaintiff stated that he worked at Sears for approximately thirty (30) to thirty-five (35) hours a week, and earned $7.50 an hour, plus a commission.  [T. 351].  The ALJ asked the Plaintiff if he had received a W-2 form in the previous year, and the Plaintiff stated that he had, and that it had shown that he had earned about $9,000.00.  Id.  The ALJ then asked the Plaintiff if he had kept copies of his wage stubs, showing what he had earned at Sears, and the Plaintiff replied that he did not have those stubs with him at the Hearing, but could produce them through his attorney.  Id.

At that point in the Hearing, the Plaintiff's attorney interrupted, and explained that the evidence showed that the Plaintiff's gross earnings began to exceed $800 per month in June of 2004, and had remained above that level in every subsequent month. Id.  For that reason, the Plaintiff's attorney stated that the Plaintiff was amending his application to include a closed period of disability, commencing May of 2002, and continuing through August of 2004.  [T. 351-52].  The ALJ asked the Plaintiff's attorney, why the Plaintiff was asking for DIB through August of 2004, if he admitted

that he had exceeded the substantial gainful activity level as of June of 2004, and the Plaintiff's attorney replied that his theory was that the Plaintiff had needed to demonstrate his capacity to earn at that level to reach a SGA level.  [T. 352].

The ALJ then resumed his questioning of the Plaintiff, and asked him to describe the deliveries that he made in his position at Sears.  Id.  The Plaintiff testified that he worked with a co-worker, who was the sole driver, although the Plaintiff explained that his driver's license had recently been restored, and he drove himself on a personal basis.  Id.  The Plaintiff testified that he typically worked from 10:00 o'clock a.m. until 6:00 o'clock p.m., Monday through Friday, although he did not have a consistent schedule, and he occasionally worked on a Saturday or Sunday.  [T. 353].  The ALJ asked the Plaintiff if he had performed any other work since May of 2002, and the Plaintiff replied that he had not.  Id.

Next, the ALJ asked the Plaintiff if he had received any other income since May of 2002, and the Plaintiff replied that he had received $18,000.00 from his automobile insurance, to replace lost income, and also received $11,000.00 from his own personal disability insurance.  [T. 353-54].  The ALJ asked the Plaintiff about his personal disability insurance, and the Plaintiff testified that he had received benefits for about six (6) months during the relevant period.  [T. 354].  In response to the ALJ's inquiry,

- 24 -

the Plaintiff replied that his wife also worked, originally at the First National Bank in Montevideo, Minnesota, and, at the time of the Hearing, at Kline Financial in Chaska, Minnesota.  Id.

The ALJ next asked the Plaintiff about how he got his job at Sears, and the Plaintiff stated that he had seen an advertisement in the newspaper, and that his mother was a friend of the store owners.  Id.  The Plaintiff added that one of the two owners, "Larry," had hired him, but that the other owner, "Ann," was very uncomfortable with his seizures, and had told him that she would not have hired him. [T. 355].  The ALJ asked the Plaintiff if the job was going well, and he replied that it was, and that, in addition to his work, he was taking an online course for appliance repair, and hoped to start work in that capacity soon.  Id.

The ALJ then turned to the Plaintiff's medical history, and asked if he was currently taking any medications.  Id.  The Plaintiff testified that he was no longer taking any medications, but had previously been taking Effexor, and also Lexapro, which he had only stopped taking a month before the Hearing, because he felt that it was not of benefit to him.  Id.  The Plaintiff added that he had been on some form of antidepressant since his accident, but that he had bad side effects on Effexor, for the

two years that he took it, including dizziness and fatigue, and so had switched to Lexapro. [T. 355-56].

The ALJ then turned to the work that the Plaintiff had been performing prior to his accident. [T. 356]. The Plaintiff testified that he had owned his own business, selling Mack tools out of a truck. Id. The Plaintiff stated that he had originally worked for a commission from Mack, but had then purchased his territory, so that he could manage his business according to his own taste. Id. The ALJ asked the Plaintiff if the truck, in which he had his accident, was his work truck, and he reported that it was, and that he was working at the time of the accident. Id. The ALJ asked the Plaintiff about the lawsuit that he had filed as a result of the accident, and the Plaintiff explained that he had his work truck serviced at the local Ford dealership and, after working on his brakes, the mechanic had failed to tighten the wheel, causing the wheel to fall off while the Plaintiff was driving. [T. 356-57].

The Plaintiff added that his lawsuit against the Ford dealership was still pending, that settlement negotiations had not been successful, that no depositions had been taken, and that, while his attorneys had conducted medical examinations, the Ford dealership had not yet conducted its examinations. [T. 357]. The ALJ asked the Plaintiff if the medical exams, which had been conducted for the litigation, were in the

Record, and he replied that they were.  Id.  The ALJ asked the Plaintiff if his attorney had sent him to see any medical experts, and the Plaintiff replied that he had not, id., although he added that his attorney had recommended that the Plaintiff see Dr. Gates, because he was an expert in the type of seizures that the Plaintiff experienced.  [T. 358].

The ALJ next asked the Plaintiff about his previous work experience.  Id.  The Plaintiff testified that he worked for the tool company from 1997 until 2000, and that, prior to that, he had worked at a bowling alley, and as a motorcycle mechanic.  Id.  He explained that he was a night manager at the bowling alley, where he worked on machines, and rented shoes.  Id.  The ALJ asked the Plaintiff why he had given up the motorcycle repair business, and the Plaintiff testified that he had been recruited by the tool dealer, that he had used at the time, to start his own business serving the area.  Id.  The ALJ asked the Plaintiff if he had a motorcycle, and the Plaintiff stated that he had sold his motorcycle the previous summer, since he was not able to ride it and it was depreciating in value. [T. 358-59].  The Plaintiff testified that the only mechanical work he had performed since his accident had been on his brother's car -- a project he had begun about six (6) months before the Hearing.  [T. 359].

The ALJ then asked the Plaintiff what he had done in the period between the accident and the start of his position at Sears.  Id.  The Plaintiff testified that he had not done much, because he was afraid to go very far from his house, or perform yard work.  Id.  He stated that he had avoided cooking, because he had a gas stove, and could not do laundry, because it required him to go into his basement, and he had experienced a couple of seizures while walking up or down stairs.  [T. 359-60].  Consequently, he had watched a lot of television, and played on his computer.  [T. 360].  In response to the ALJ's question, the Plaintiff stated that he left his house daily to go for a walk with his wife, and maintained the same routine on the weekends, only rarely going out to eat with friends.  Id.  The Plaintiff testified that he had been unable to drive during that period, and had given up riding a bicycle after his physician had suggested that this was ill-advised.  Id.  The ALJ asked the Plaintiff if he performed any housework, and the Plaintiff replied that he could vacuum and wash dishes, but could not perform most yard work, like mowing the lawn, unless his wife was present to supervise.  [T. 360-61].

The ALJ asked the Plaintiff what he would do during that period if he were alone, and the Plaintiff testified that he would try to stay somewhere that he felt was safe, such as on the sofa.  [T. 361].  The Plaintiff would read the news on his

computer, but he testified that he did not play games on it. Id.  The ALJ asked the Plaintiff if he took any trips during that period, and the Plaintiff replied that his parents had purchased airplane tickets for he and his wife to fly to Florida once , so that he could visit his grandparents.  Id.  The ALJ asked the Plaintiff if he had any hobbies, and the Plaintiff explained that most of his hobbies were mechanical, such as wood working, and he had to give them up because they were dangerous if he had a seizure.  [T. 361-62].  The Plaintiff added that, when his wife was around, he had engaged in a little remodeling, but he would not attempt something like that when he was alone.  [T. 362].  The ALJ asked the Plaintiff about his other ADL during that period, and the Plaintiff stated that he did not belong to any clubs, would occasionally go shopping with his wife, would rarely attend movies, and gave up attending church after he had a seizure during the services.  Id.

The ALJ next asked the Plaintiff if he had sold everything relating to his former business, and the Plaintiff replied that he had, and added that he had recently sold a trailer, leaving debt as the only trace of his former business.  [T. 363].  The ALJ asked the Plaintiff if he planned to return to tool sales, and the Plaintiff replied that his current intent was to concentrate on appliance repair.  Id.

The ALJ then turned to the Plaintiff's medical history, and asked him if he was still experiencing seizures. Id. The Plaintiff testified that he had not had a seizure in over six (6) months. Id. The ALJ asked the Plaintiff to describe his seizures. Id. The Plaintiff noted that he could not remember them, but could only describe what he had been told, which was that, when they started, he displayed a blank stare, and would then slump, fall over, convulse, and lose consciousness. Id. The Plaintiff added that, if someone woke him, he could regain consciousness within five (5) minutes, but he would be unable to talk, be extremely tired, and would suffer from a very bad headache. Id. The Plaintiff noted that, if no one woke him, he could sleep for hours. Id.

The ALJ asked the Plaintiff why he thought that he had stopped having seizures, and the Plaintiff replied that he was not sure, but that his doctors had always suspected that they would stop on their own, eventually. Id. In response to the ALJ's question, the Plaintiff replied that his doctors had told him that the best way to lessen his seizures was to stay away from stressful situations, which was part of the reason that they had been against his return to work. [T. 364]. The Plaintiff admitted that he had probably gone back to work before he should have, but stated that he had needed the money. Id. The ALJ asked the Plaintiff if he had ever had a seizure before the

accident, and he replied that he had not, adding that he suspected that the first time he had a seizure was about a week after the accident, although he could not be sure because he was bedridden at the time. Id. The Plaintiff testified that the first time he was certain he had a seizure, he fell and hit his face on a coffee table. Id.

The ALJ asked if the Plaintiff's psychiatrists or psychologists had any theories about what caused the seizures, and the Plaintiff replied that their theory was that the seizures were originally organic, meaning that his brain developed a learned response, caused partially by the accident. [T. 364-65]. The Plaintiff added, however, that his doctors felt that the seizures could also be caused by other stressors in his life. [T. 365].

The ALJ asked the Plaintiff if he still exercised daily, and the Plaintiff said that he worked out on a bowflex machine, and on a treadmill, for approximately one (1) hour a day. Id. The Plaintiff noted that exercising was one of the few things that he felt he could do when he was suffering from seizures, although he gave up using free weights as he felt they were too dangerous. Id. The Plaintiff stated that his other main source of exercise, during the period in question, was walking his two (2) dogs at night with his wife, or playing fetch with them. Id. The Plaintiff testified that he did not go camping, hunting, or fishing. Id.

Next, the ALJ asked the Plaintiff about medical records which reported that, in December of 2002, the Plaintiff was found to read better in a mirror than he did with a page in front of him.  Id.  The Plaintiff explained that he had a seizure on July 1, 2002, and, after that, he suffered from speech problems that did not go away, unlike the transient speech problems that had followed his previous seizures.  [T. 366].  As a result, he saw a speech therapist for four (4) to five (5) months, during which time, he found that he could write things backwards better than forwards, and also could recite the alphabet backwards.  Id.  The ALJ asked the Plaintiff if he could still read in a mirror, and the Plaintiff admitted that he had not tried.  Id.

In response to the ALJ's inquiry, the Plaintiff testified that he continued to see Dr. Gates about every six (6) months, but that, on his last visit on February 2, 2005, he had seen a different doctor.  Id.  The ALJ asked the Plaintiff what Dr. Gates had told him during his most recent visit, and the Plaintiff testified that Dr. Gates had found that the Plaintiff was doing well, and that he hoped that his seizures were over.  Id.  The Plaintiff added that he still saw Lucas infrequently, having last seen him on March 17, 2005, with the previous visit three (3) months earlier. [T. 367].  In response to the ALJ's question, the Plaintiff noted that he had also been seeing Dr. Vamacka, a psychiatrist, but that he had not seen her in six (6) months, and had his next

appointment with her in April of 2005.  Id.  The Plaintiff added that there were no other doctors, or counselors, that he was seeing regularly. Id.

The ALJ then turned his inquiry to the Plaintiff's plans for his future, and the Plaintiff stated that, while he had considered a career in health and fitness, after he was hired at Sears he had decided to concentrate on appliance repair.  Id.  At the time of the Hearing, the Plaintiff reported being approximately half-finished with his on-line appliance repair course, with almost perfect scores on his exams.  [T. 368].

The ALJ asked the Plaintiff if he had any physical residuals from the accident, and the Plaintiff replied that he had whiplash that occasionally caused his neck to catch when he was trying to turn, but that he did not experience that every day.  Id. He had also experienced cuts and bruises from his seizures, and still had problems with his left knee as a result of the accident.  Id.

The ALJ turned his questioning to the Plaintiff's psychological evaluation, which was conducted in May of 2003, and in which he was administered the MMPI. Id.  The Plaintiff stated that he had taken the MMPI once before, when he was fourteen (14) years old, and had also taken another test, similar to the MMPI, after the accident, but that he was not sure which doctor had administered the test.  [T. 369]. The ALJ then asked the Plaintiff's counsel if all of the medical and psychological

records, which had been generated since the date of the accident, were included in the Record, and the Plaintiff's attorney replied that, to the best of his knowledge, they were. Id.

The ALJ asked the Plaintiff if he still experienced car sickness, and he confirmed that he did not get sick if he was riding in a straight line, but had to lie down if the car he was in turned corners. [T. 370]. However, he added that he did not experience car sickness when he was driving himself. Id. The ALJ asked if the Plaintiff had filed for bankruptcy, and he stated that he had considered it, but was still trying to avoid taking that step. Id.

The Plaintiff's attorney then asked the Plaintiff about his employment history. Id. The Plaintiff testified that he had stopped working on May 21, 2002, which was the date of the accident, because he drove for a living, and Minnesota law barred him from driving for six months after having a seizure. [T. 370-71]. The Plaintiff's attorney asked if he could have driven safely during the relevant period, if Minnesota did not have a law barring him from operating a motor vehicle, and he replied that he could not. [T. 371]. The Plaintiff added that, since he had begun work at Sears, he had one (1) seizure while at work, that was witnessed by the owner and a fellow employee, and that, at other times, he had been forced to take time off work because

- 34 -

he felt that a seizure was imminent.  [T. 371-72].  The Plaintiff noted that he had missed approximately eight (8) to ten (10) full days of work, and had to arrive late, or go home early, about ten (10) times, as a result of his seizures.  [T. 372].  The Plaintiff's attorney then asked how often his seizures took place, in the period between June of 2002, and the summer of 2004.  Id.  The Plaintiff testified that he averaged several seizures a day at the beginning, which gradually tapered off to a couple of seizures a week, by the end of the first year.  [T. 372].  When asked when his seizures had decreased to fewer than one (1) per month, the Plaintiff stated that  that had occurred as recently as "last August or September" [of 2004], and that at the time of the Hearing, it had been six (6) months since his last seizure. [T. 373].

Next, the Plaintiff's attorney questioned him about his daily activities.  Id.  The Plaintiff explained that, during the period when he was having seizures, he was not able to cook, although he could use a microwave, but could not do laundry because it involved walking down his basement stairs.  Id.  Additionally, he did not do yard work on his own, and could not use power tools, although he continued to use a hammer and nails.  [T. 373-74].  The Plaintiff testified that he was unable to shop on his own, and had to abandon the remodeling work, that he had been performing on his home, prior to the accident.  [T. 374].  The Plaintiff's attorney asked if the Plaintiff

could have lived on his own during the period between June of 2002, until the summer of 2004, and he replied that he could not.  Id.  The Plaintiff added that several times during that period, his wife had to take him to the hospital, after she had come home from work and found him bleeding on the floor.  Id.

The Plaintiff's attorney asked the Plaintiff how his seizures had affected his church attendance, and the Plaintiff responded that he had previously gone to church "pretty regularly," but that, after he had experienced a seizure while at church, he gave up attending Sunday services.  [T. 374-75].  The Plaintiff also testified that, before the accident he had gone to family gatherings at least once a week, but that he had stopped going after he began having seizures, because he felt embarrassed.  [T. 375].  The Plaintiff testified that, as a result of his seizures, he and his wife had given up going out to eat, going to bars, or seeing friends, and he had also abandoned his weekly trips to a racetrack in Montevideo.  Id.  The Plaintiff noted that curtailing his social life had negatively affected his relationships with friends, and he suggested that it had played a "very significant role" in his current separation from his wife.  [T. 376].

Next, the Plaintiff's attorney asked how his seizures had affected the Plaintiff's ability to concentrate on his work, at times when he was not having seizures.  Id.  The Plaintiff replied that he found himself distracted, and added that, when he felt that he

might have a seizure, his boss would send him home.  Id.  Additionally, once the

Plaintiff had a seizure, it would be "at least a couple of hours" before he was coherent

enough to perform any task, and his speech was always affected.  [T. 376-77].  The

Plaintiff also suffered from major headaches after a seizure, and was extremely tired,

and did not recover until he had been able to sleep for two (2) or three (3) hours.  [T.

377].  When asked by his attorney about the impairments in his speech and writing,

the Plaintiff explained that, from July 1, 2002, until around the end of December of

2002, he had attended four (4) months of speech therapy about two (2) to three (3)

times a week.  Id.

The Plaintiff's attorney then asked him who had given him advice regarding his

ability to work during the period from May or June of 2002, until December of 2004.

Id.  The Plaintiff noted that Drs. Vamacka and Gates had both told him that he should

not work during that period, and that Dr. Hanna and Lucas had agreed with that

assessment.  Id.  The Plaintiff added that, during that period, he had also spoken with

a vocational counselor, John Croom ("Croom"), who worked with the Minnesota

Workforce Center, and who had felt that the only employment opportunity available

to the Plaintiff would involve working from his home.  [T. 377-78].  According to the

Plaintiff, Croom felt that no employer would hire him with seizures as frequent as his were during that period.  [T. 378].

The Plaintiff's attorney asked about the Plaintiff's mental health history, and the Plaintiff responded that he had a history of depression prior to his accident, which was diagnosed when he was fourteen (14) or fifteen (15), and that he had been "on and off" antidepressants since that time.  Id.  He added that he felt that his problem was seasonal affective disorder, because he felt worse in the wintertime.  Id.  The Plaintiff's attorney asked if he had been seeking help for his depression at any time prior to the accident, and the Plaintiff replied that he was being seen at the Woodland Center, by Lucas and Dr. Vamacka, and had been prescribed Effexor.  [T. 379].  The Plaintiff added that, since 2000, he had taken a number of different antidepressants, including Lexapro and Wellbutrin,[7] and had been taking antidepressants at the time of the accident.  [T. 379-80].

The Plaintiff's attorney asked the Plaintiff if he felt that he would have been able to perform any work, which he had performed in the past, during the period

---

[7]Wellbutrin "is indicated for the treatment of depression."  Physician's Desk Reference, p. 1579 (60th ed. 2006).

between June of 2002. to 2004, and the Plaintiff replied that he did not believe he could have performed any competitive work during that period.  [T. 380].

When the Plaintiff's attorney asked him who had witnessed his seizures, the Plaintiff stated that they had been witnessed by his parents, friends, and doctors.  Id. At that point in the Hearing, the ALJ noted that the ME entered the room.  Id.  The Plaintiff then resumed his testimony, explaining that his boss had also witnessed a seizure and, as several of his seizures had taken place in public, he speculated that he had been witnessed having a seizure by several hundred people.  [T. 381].

The ALJ swore the Plaintiff's mother, Kathy Thalberg ("K. Thalberg"), to testify.  Id.  K. Thalberg stated that she saw the Plaintiff frequently between June of 2002, and the summer of 2004, and that, during that period she had witnessed three (3) seizures.  [T. 382].  The Plaintiff's attorney asked K. Thalberg to describe the seizures that she had witnessed.  Id.  K. Thalberg testified that the first time she witnessed the Plaintiff have a seizure, she had been watching television with the Plaintiff and his wife, when he stopped talking, and began staring blankly.  Id. According to K. Thalberg, the Plaintiff did not respond to external stimuli, even after his wife nudged him with her elbow, and waved her hands in front of his face.  Id. After approximately thirty (30) seconds, the Plaintiff started to twitch, which

continued for about one (1) minute, while his wife stood by him, and talked to him and shook his arm.  [T. 383].  K. Thalberg testified that, when the Plaintiff finally opened his eyes, his pupils were dilated and he appeared confused.  Id.

K. Thalberg also described the next seizure that she had witnessed, in which the Plaintiff, who had been lying on the floor, again stopped talking and started to convulse, banging his head on the floor.  [T. 384].  In that seizure, the convulsions lasted only about twenty (20) or thirty (30) seconds, but the Plaintiff remained unresponsive for one (1) to two (2) minutes, with the entire seizure lasting approximately five (5) minutes.  Id.  K. Thalberg added that, after the Plaintiff was roused, he continued to have difficulty communicating, had slurred speech, could not stand by himself, and complained about being very tired.  Id.  Finally, K. Thalberg described the third seizure that she had witnessed, which took place at a holiday party, and followed the same basic pattern as the others.  [T. 385].

In response to the inquiry of the Plaintiff's attorney, K. Thalberg testified that she had seen numerous injuries on the Plaintiff from his seizures, including cuts and stitches, bruises, and injured hands and knees.  Id.  According to K. Thalberg, the Plaintiff had been taken to the hospital three (3) times for stitches to his face, in order to repair cuts that took place after he had fallen during a seizure.  [T. 386].  K.

Thalberg added that, as a result of the impairments in the Plaintiff's speech and communication abilities, which were caused by his seizures, the Plaintiff had become withdrawn. Id. K. Thalberg explained that, when the Plaintiff's speech was impaired, he struggled to find the right words, and when he did speak, the words did not make sense. [T. 387]. The Plaintiff's physicians subsequently discovered that the Plaintiff was saying the correct words, but backwards. Id. K. Thalberg testified that the Plaintiff's speech problems had lasted for several months, and made him nearly impossible to understand. Id.

The ALJ then noted that, as the ME had arrived late to the Hearing, and "there's a bunch of new exhibits," he declined to ask the ME any questions. [T. 388]. The ALJ subsequently swore the VE to testify, and the Plaintiff's attorney noted no objection to his qualifications. Id. The VE testified that he was able to be an impartial witness, and had an opportunity to review the Record, and hear the Plaintiff's Hearing testimony. [T. 389]. The ALJ asked the VE if he wanted to make any changes in his work summary, and the VE stated that he would add light skilled work to the Plaintiff's summary, due to his work as a Mack salesman, and also would classify the Plaintiff's work at Sears as semi-skilled, light work, with the delivery part of the

position semi-skilled, and heavy.  <u>Id.</u>  The VE then stated that he was prepared to direct his testimony to the national economy.  <u>Id.</u>

The ALJ posed a hypothetical to the VE, and stated that it was premised on an assumption that the Plaintiff's testimony at the Hearing was fully credible.  <u>Id.</u>  Based on that premise, the ALJ asked the VE if the hypothetical individual was capable of performing any of the Plaintiff's past relevant work from May of 2002, until August of 2004.  [T. 389-90].  The VE testified that, based upon the Plaintiff's testimony, he had too many absences from work, during that period, to perform competitive employment, although it appeared that he was successful when he began working for Sears, in June of 2004.  [T. 390].

The ALJ then posed a second hypothetical, in which he asked the VE to assume an individual of the Plaintiff's age, education, and past relevant work experience, who suffered from all of the impairments described by the Plaintiff at the Hearing.  <u>Id.</u>  The individual could concentrate on, understand, and remember routine, repetitive instructions, and carry out tasks with adequate persistence and pace, for routine, repetitive tasks.  <u>Id.</u>  The individual's ability to interact and get along with co-workers would be mildly impaired, but adequate for most social contact, and he would be limited to brief and superficial contact with the public.  <u>Id.</u>  The individual could

tolerate ordinary levels of supervision found in the customary work setting, and could also tolerate the routine stressors of a routine, repetitive work setting.  Id.  In response, the VE testified that the only job, from the Plaintiff's past relevant work, that the individual described in the second hypothetical could perform, would be non-skilled work as a clerk in a convenience store for, even though that position required contact with the public, the contact was brief and superficial.  [T. 391].

The VE testified that there were 400,000 positions in the national economy for convenience store clerks.  Id.  The ALJ asked if there were any other positions that would fit in the second hypothetical, and the VE responded that a wide range of sedentary and light or medium, unskilled occupations existed that would not require sustained contact with the public, and would be routine and repetitive, such as mail clerk, motel cleaner, or hand packager.  Id.  According to the VE, mail clerk and motel cleaner were both light and unskilled positions, with 51,000 mail clerk positions available, and over 400,000 motel cleaner positions available nationally.  [T. 391-92].

The ALJ then asked how the hypothetical individual's ability to perform those positions would be affected if he had seizures, and needed to avoid dangerous equipment.  [T. 392].  The VE testified that some hand packaging would be done on

an assembly line, and so would be eliminated, but that the other positions as mail clerk, motel cleaner, and convenience store clerk, did not involve dangerous equipment, and so would not be affected.  Id.

The Plaintiff's attorney then asked the ALJ to identify the diagnoses before the Disability Determination Services, when they arrived at the list of limitations, and the ALJ stated that the State Agency had used 12.04 and 12.07.  Id.  The Plaintiff's attorney then asked the VE at what frequency seizures precluded competitive employment.  [T. 393].  The VE replied that seizures of more than once or twice a week would not be tolerated, or absences from work of more than twice a month.  Id.  The Plaintiff's attorney then asked the VE if an individual's susceptibility to unpredictable seizures would affect an individual's ability to work as a convenience store clerk in the private sector, and the VE replied that such a limitation would probably cause an employer to terminate employment, if the employer felt that the seizures would happen on a regular basis.  Id.

The ALJ then asked the Plaintiff if he had any additional evidence, and the Plaintiff's attorney replied that he would submit a signed copy of the statement from the Plaintiff's wife, as well as the Plaintiff's monthly wage statements.  [T. 394].  The Plaintiff's attorney reiterated that he believed that the Plaintiff met the Part A criterion

for the listing under 12.07, somatoform disorders, and also the Part B requirement, as he had marked restrictions in daily living, and difficulties maintaining concentration, persistence, or pace.  [T. 394-95].  The Plaintiff's attorney argued that the Plaintiff's social functioning was impaired, and that, as a practical matter, no private employer was going to employ someone who was having seizures as frequently as the Plaintiff had them, which he characterized as more than one (1) per month of the grand mal type, and greater than one (1) per week of the petit mal type. [T. 395-96].

The ALJ noted that he would keep the Record open for a week, in order to allow the Plaintiff to introduce the signed statement from his wife and his wage stubs, and concluded by stating that he would issue a ruling after the Record had been closed. [T. 396].

C.     The ALJ's Decision.  The ALJ issued his decision on June 23, 2005.  [T. 19-31].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §§404.1520.[8]  As a threshold matter, the ALJ

---

[8]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities;

concluded that the Plaintiff had not engaged in substantial gainful activity during his

alleged period of disability, from May 21, 2002, through August of 2004.  [T. 21].

Next, the ALJ examined whether the Plaintiff was subject to any severe

physical impairments, which would substantially compromise his ability to engage in

work activity.  Id.  After considering the Plaintiff's medical history, which included

the reports of the Plaintiff's treating physicians, and the testimony adduced at the

Hearing, the ALJ found that the Plaintiff was severely disabled by a longstanding

history of depression and headaches, a mild herniated disc in his thoracic spine, mild

short-term memory problems, aphasia, and episodic loss of consciousness of unknown

etiology, following a motor vehicle accident on May 21, 2002.  [T. 21-22].

---

(3) whether the claimant has an impairment that meets or
equals a presumptively disabling impairment listed in the
regulations; (4) whether the claimant has the residual
functional capacity to perform his or her past relevant
work; and (5) if the claimant cannot perform the past work,
the burden then shifts to the Commissioner to prove that
there are other jobs in the national economy that the
claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has
an impairment that limits his ability to perform basic work activities; and his
impairment is either presumptively disabling, or he does not have the residual
functional capacity to perform his previous work, and he cannot perform other work
existing in the national economy.  Id. at 754.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §§404.1520(d).  The ALJ determined that the Plaintiff's impairments did not meet, or equal, the criteria of any Listed Impairment, based on the testimony at the Hearing, and on the Record as a whole.  Id.

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy.  Id.  The term RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, 20 C.F.R. §404.1545, and Social Security Ruling 96-8p.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and 20 C.F.R. §404.1529.  The ALJ also noted that he had considered all of the medical opinions in the Record, which were statements from acceptable medical sources, and which reflected

- 47 -

judgments about the nature and severity of the impairments, and resulting limitations in the Plaintiff's ability to perform competitive work.  [T. 22].

In determining the Plaintiff's RFC, the ALJ first considered the Plaintiff's work record, and found that he had demonstrated a capacity for sustained employment, that raised no motivational concerns.  Id.  However, the ALJ noted that "any probative weight which could be afforded [the Plaintiff's] allegations of 'disability' by virtue of [the Plaintiff's] past work record is significantly compromised by suggestions in the record that [the Plaintiff] may have maintained a sick role for financial reasons."  Id.  The ALJ found that the Plaintiff had filed a lawsuit following his motor vehicle accident, and considered as significant the Plaintiff's testimony at the Hearing that he had received $18,000.00 from his automobile insurance company for lost income, and $1,100.00 per month, for a six (6) month period, from personal disability insurance.  [T. 23].

The ALJ also observed that the Plaintiff had undergone numerous evaluations, after the accident, by his treating physicians, and considered the statements, and affidavits, submitted by those medical professionals in support of the Plaintiff's disability claim.  Id.  In weighing those statements, the ALJ found that the opinions of the Plaintiff's treating physicians were based on the Plaintiff's subjective

complaints, rather than on any significant clinical findings, and the ALJ did not find the Plaintiff's complaints to be entirely believable. Id. Consequently, the ALJ did not give significant weight to those opinions. Id.

The ALJ noted that the Plaintiff alleged disability for a closed time period starting on May 21, 2002 -- the date that he was involved in a motor vehicle accident -- and lasting until August of 2004, two (2) months after he began working for Sears. Id. At the Hearing, the Plaintiff alleged that he was disabled during that period due to the unpredictable nature and severity of his seizure activity. Id. The ALJ considered the Plaintiff's testimony, that he had been working on a full-time basis selling Mack tools prior to the accident date, and that, in the week following the accident, he began experiencing seizures, which he continued to experience daily, from June of 2002 until the summer of 2004, and then at decreased levels, until eventually he ceased having seizures in September of 2004. Id.

The ALJ also considered the Hearing testimony of the Plaintiff, that his treating psychologist had told him that his seizures were a "learned response," which was partially caused by his motor vehicle accident. Id. The Record included evidence that the Plaintiff had no memory of his seizures, but that he had been told by those who had witnessed them that he developed a blank stare, then slumped over, fell down, and

convulsed.  Id.  The ALJ noted that the Plaintiff testified that, upon wakening from a seizure, he would develop a headache and fatigue, following which he would have to rest.  Id.  The ALJ also considered the Plaintiff's testimony, that his treating physicians told him to avoid stress and to refrain from working, and also told him that, eventually, his seizures would go away.  Id.

As additional evidence, the ALJ considered the Plaintiff's claim that his activities were very limited during the relevant time period.  Id.  At the Hearing, the Plaintiff testified that once he began to experience seizure activity, he had to stop working because he could not drive, and that he had only recently been able to renew his driver's license.  Id.  The ALJ noted that the Plaintiff's statement that he felt very limited, from a functional standpoint, during the period in question, feeling "safest" when he was on his couch.  Id.  The Plaintiff sold his tool business, and did not work until June of 2004, when, with the assistance of his mother, he was able to obtain a job at Sears.  Id.  Finally, the ALJ took into consideration the Plaintiff's testimony that his job at Sears was going well, and that, at the time of the Hearing, he was taking an online appliance repair course, which was also going well. [T. 24].  The ALJ acknowledged the Plaintiff's testimony that he had one (1) seizure while working at Sears, which was witnessed by the owner.  Id.

The ALJ expressed sympathy for the Plaintiff, and his situation, but noted that the Record reflected that the diagnoses of the Plaintiff's symptoms, over the course of his treatment, included "spells of undetermined etiology," "post concussive syndrome," "episodic loss of consciousness, etiology unclear," "atypical seizures," "seizures disorder," "pseudoseizures," "non-epileptic events," and "conversion disorder vs. malingering vs. factitious disorder." <u>Id.</u>  The ALJ found that the Record also contained diagnoses of "episodes of speech disturbance, etiology unclear," and "expressive aphasia," for which the Plaintiff underwent speech/language therapy, which, after four (4) months, resulted in significant improvement in his communications skills.  <u>Id.</u>  In addition, the Record contained the Plaintiff's longstanding diagnosis of depression and headaches, as well as a mild disc herniation in the thoracic spine, following his motor vehicle accident.  <u>Id.</u>

The ALJ explained that, in arriving at the Plaintiff's RFC, he also considered evidence in the Record that, one (1) month prior to the motor vehicle accident, the Plaintiff presented to Woodland Centers, voicing complaints of suicidal thoughts, and was diagnosed with major depressive disorder that was recurrent and severe, but without psychotic symptoms.  <u>Id.</u>  At that time, the Plaintiff's social worker recommended that the Plaintiff undergo a psychiatric evaluation, and begin individual

therapy. Id. The ALJ observed that, at the time of his motor vehicle accident, the Plaintiff was brought by ambulance to the emergency room, at which time, he underwent a CT head scan, which was negative. Id. Approximately two (2) weeks after the accident, the Plaintiff sought treatment for seizure-like activity, and subsequently, he underwent a number of evaluations, including neurological evaluations, psychological evaluations, neurophysical evaluations, electroencephalograms (EEGs), CT scans, laboratory studies, magnetic resonance imaging (MRI) brain scans, and a lumbar puncture, all of which were negative. Id. The ALJ also considered the results of neuropsychometric testing by Dr. Sullivan, which were conducted four (4) months after the Plaintiff's accident, in September of 2002. Id. Dr. Sullivan, in her report of September 10, 2002, recorded that the Plaintiff's test results revealed inconsistencies, which suggested that the Plaintiff presented himself in a "certain way," and that he likely had a "hidden agenda." Id.

The ALJ found that, approximately three (3) months later, the Plaintiff underwent a neurological consultation by Dr. Daniel Randa, who summarized the Plaintiff's medical history in his report, as well as the fact that the Plaintiff had undergone a number of diagnostic studies, all of which had been negative. [T. 24-25]. Dr. Randa found that the Plaintiff had a probable cerebral concussion, and suffered

from episodic losses of consciousness with unknown etiology, and he described the

Plaintiff's spells as characterized by recurrent loss of consciousness, with presumably

normal EEG monitoring, suggesting that the Plaintiff's seizure events were non-

epileptic.  [T. 25].

The ALJ quoted Dr. Randa's note to the effect that the Plaintiff's speech

disturbance was "somewhat puzzling," with Dr. Randa adding that he felt that,

"although the nature of the speech disturbance was felt to be nonorganic in origin,

frontal lobe seizures may indeed be bizarre in their presentation," and that should be

taken into account despite the normal results of the Plaintiff's EEG.  Id.  After his

assessment, Dr. Randa referred the Plaintiff to Dr. Gates at the Minnesota Epilepsy

Group, noting that Dr. Gates was an expert in differentiating atypical seizure patterns

from nonepileptic events, or pseudoseizures.  Id.  Dr. Randa concluded that the

Plaintiff's episode of speech disturbance was also unclear in etiology, but was

"atypical," and that he was uncertain whether the Plaintiff's speech problems

represented stress-related features secondary to underlying depression, or an atypical

language deficit from a frontal lobe seizure focus.  Id.

The ALJ then turned to the records from the Plaintiff's admission to the adult

epilepsy unit of the United Hospital, for an evaluation of possible seizure activity, for

which he was hospitalized for a week and underwent extensive testing. Id. Dr. Robert Doss, one of the Plaintiff's evaluating neuropsychologists, wrote a report dated January 16, 2003, in which he pointed out that the Plaintiff's past history was remarkable for a major depressive disorder, psychogenic NES, and speech problems. Id. Dr. Doss administered a number of tests on the Plaintiff, which measure feigned or exaggerated memory impairment, and which can also be useful in estimating the patient's level of effort, including the VSVT, and the TOMM tests. Id. The ALJ considered evidence in the Record that the Plaintiff performed a 22/24 on the VSVT on the "easy items," and a 9/24 on the "difficult items." Id. Dr. Doss wrote that those results denoted a "less than chance performance," and described it as extremely rare even for persons with documented neurological disease. Id. The ALJ also found that the Plaintiff's response latency on the VSVT was "extremely slow," citing the fact that the Plaintiff scored a 49/50 on the TOMM on Trial 1, and a 50/50 on Trial 2. Id. Dr. Doss felt that the Plaintiff's performance on the VSVT suggested possible symptom exaggeration, or at least inadequate effort, while the TOMM performance was within normal limits. Id.

The ALJ took into consideration Dr. Doss's statement, in the Record, that he questioned the validity of the Plaintiff's assessment, and that the Plaintiff's VSVT

scores suggested exaggeration of deficit or non-existent effort, and that the behavioral

observations on the Rey Osterreith Complex Figure Test ("RCFT") and Trailmarking

Test, which were administered to the Plaintiff, reflected a very atypical performance

that did not conform to any pattern of cerebral dysfunction.  <u>Id.</u>  Dr. Doss also

recorded that his findings would not be entirely inconsistent with a diagnosis of NES,

and psychogenic aphasia, as well as a somatoform personality profile, and that the

functional qualities of the Plaintiff's presentation were consistent with Dr. Sullivan's

conclusions that psychiatric and/or motivational factors were probably contributing

to the Plaintiff's symptoms.  [T. 25-26].  Dr. Doss's suggested diagnoses included

conversion disorder, factitious disorder, or malingering, and he recommended ongoing

mental health evaluation, and treatment, to determine the basis for such a symptom

presentation.  [T. 26].  Finally, Dr. Doss opined that consideration should be given to

secondary gain to maintain disability status for financial reasons, and he declined to

recommend further neuropsychological testing unless a clear decline was detected,

and the Plaintiff's psychiatric condition or motive were resolved.  <u>Id.</u>

The ALJ also considered the records of Dr. Gates, from March of 2003, that

the Plaintiff was undergoing counseling with a social worker, who was going to refer

him to a doctor specializing in conversion disorders.  <u>Id.</u>  Dr. Gates' notes revealed

that the only medication that the Plaintiff was taking was Effexor, and suggested as his diagnosis that the Plaintiff suffered from NES, a history of major depressive disorder, and conversion disorder versus malingering versus factitious disorder.  Id. The ALJ noted Dr. Gates' recommendation that the Plaintiff continue to undergo counseling, and return to the Minnesota Epilepsy Group Clinic in three (3) months. Id.  The ALJ added that the Record contained evidence of the Plaintiff's visit with Dr. Gates on June 23, 2003, at which time, the Plaintiff stated that his NES had decreased in frequency to one (1) to two (2) events a week, followed by a couple of weeks with no events.  Id.  Dr. Gates reported that the Plaintiff continued on Effexor, and had added Lexapro, and Trazodone, and advised the Plaintiff to continue counseling, and to return in six (6) months.  Id.

The ALJ also considered the treatment notes of Dr. Randa, from July of 2003, which reported that the Plaintiff was "extremely pleased" with his consultations with Dr. Gates, which he had found very helpful in understanding his "paroxysmal non-epileptic events," and was also pleased with his treatment by his psychologist, Dr. Thurber.  Id.  The Plaintiff advised Dr. Randa that he was experiencing only one (1) seizure a week, and that he understood that his "behavior pattern related to stress and anxiety," which he felt he was getting under better control.  Id.  The ALJ considered

Dr. Randa's conduct of a physical and neurological examination of the Plaintiff, which found him to suffer from paroxysmal NES, which was improved with current therapy, and status post motor vehicle accident, which was described as stable.  Id. Dr. Randa encouraged the Plaintiff to continue his current therapy with his psychologist, and to return in six (6) months, following his visit with Dr. Gates, at which time, he would decide if he needed to return for any follow up visits.  Id.  Dr. Randa also reassured the Plaintiff that he was making excellent progress, and that he hoped that the Plaintiff's spells would gradually dissipate over time.  [T. 26-27].

The ALJ also considered evidence that the Plaintiff returned to Dr. Gates on December 4, 2003, and again, on July 14, 2004.  [T. 27].  In his notes from the visit in December of 2003, Dr. Gates observed that the Plaintiff had undergone counseling for NES and depression, and added that he had agreed to write a letter on the Plaintiff's behalf for disability benefits.  Id.  During the visit in July of 2004, the Plaintiff informed Dr. Gates that his NES had decreased in frequency to one (1) seizure every two (2) to three (3) weeks, and that he experienced an "aura" prior to these events, which gave him the feeling that something was about to happen.  Id.  The Plaintiff also reported that he continued to see a counselor, but had decreased the frequency of his visits since he began working at Sears.  Id.

The ALJ also considered notes from the Plaintiff's next visit to the Minnesota Epilepsy Group Clinic, on February 2, 2005, at which time, he was evaluated by Dr. Mouderres, who noted that the Plaintiff had been event-free for approximately five (5) months. Id. The Plaintiff told Dr. Mouderres that he and his wife had recently separated, but that the resultant stress had not precipitated any nonepileptic events. Id. Dr. Mouderres responded to the Plaintiff's admission, that he had not been seeing his counselor as often as he had previously, with the recommendation that he continue to pursue therapy, but reported that the Plaintiff did not need any further follow-up visits with him, unless the Plaintiff felt that they were necessary. Id.

In considering the Plaintiff's medical history, the ALJ observed that the Record contained "a significant number of inconsistencies and incongruities which call into question the alleged severity and frequency" of the Plaintiff's seizures, and led to the ALJ's conclusion that the Plaintiff's testimony was not credible in those respects. Id. Specifically, the ALJ noted Dr. Sullivan's suggestion, following neuropsychometric testing of the Plaintiff in September of 2002, that the Plaintiff's inconsistencies suggested a hidden agenda, and that the lack of a consistent cohesive pattern, with deficits across tasks, was an undeniable indicator that the Plaintiff was not suffering from true aphasia. Id. The ALJ also considered the statement of Dr. Doss, who felt

that the validity of the Plaintiff's assessment was called into question by his performance on symptom-validity testing, and other qualitative indicators, and opined that psychiatric and/or motivational factors were likely contributing to the claimant's symptom patterns. Id. Dr. Doss also identified a conversion disorder, factitious disorder, and malingering, as possible diagnoses, and suggested continued mental health evaluation and treatment, in order to address the basis of these symptoms. Id.

In addition, the ALJ considered the results of the Plaintiff's evaluation by Dr. Rameriz at the University of Minnesota Hospital, which included a full work-up and EEG, as well as psychometric testing, which showed considerable inconsistencies, and suggested that the Plaintiff's speech problems, and black out spells, were emotionally based. [T. 28]. The ALJ stated that Dr. Randa was also unable to determine an etiology for the Plaintiff's speech disturbances, or for his loss of consciousness. Id. In January of 2003, Dr. Gates observed that the Plaintiff was involved in litigation, and that, based on the inconsistent results of the neuropsychological testing, along with the Plaintiff's psychological profile, it was impossible to distinguish between a conversion disorder, malingering, or a factitious disorder. Id. Dr. Gates added that the Plaintiff was "quite invested" in his diagnosis with NES. Id.

The ALJ took into consideration a form, which was signed by Dr. Gates on March 16, 2005, and in which he opined that the Plaintiff had been unable to work, in a competitive setting and on an ongoing basis, from May of 2002, through August of 2004. Id. As noted by the ALJ, the Record contained additional treating physician disability opinions, from Dr. Hanna, Dr. Vomacka, and Lucas, as well as third party statements from the Plaintiff's wife, and his employer at Sears, together with the Hearing testimony of the Plaintiff's mother, who said that she saw the Plaintiff at least once a week during the period in question, and witnessed three (3) of his seizures, and that he was becoming socially withdrawn. Id. The ALJ considered all of those opinions, but was unable to place significant weight on them, given the lack of clinical objective findings, combined with the inconsistencies and incongruities in the Record, which suggested that all of those opinions were based on the Plaintiff's subjective complaints, which the ALJ had already determined were not entirely credible. Id.

The ALJ noted that, at the Hearing, the Plaintiff alleged that he could not have performed any work activity, due to the frequency of his seizures, from May 21, 2002, through August of 2004. Id. However, the ALJ found that, within one (1) year from the alleged onset date, the Plaintiff's non-epileptic events had decreased in frequency to one (1) to two (2) spells in a given week, often followed by a two (2) week period

- 60 -

where the Plaintiff did not experience any spells.  Id.  The ALJ added that the Plaintiff

averred that he experienced severe dizziness and fatigue, which he attributed to

Effexor, but that clinical notes, from Dr. Gates, which are dated March 6, 2003, June

23, 2003,  December 4, 2003, and July 14, 2004, disclosed that the Plaintiff denied

any known drug allergies, or any negative medication side effects.  [T. 28-29].

The ALJ also considered the Psychiatric Review Technique Form ("PRTF")

which had been completed by the State Agency medical consultants on August 19,

2003, and in which they opined that the Plaintiff had an affective disorder and a

somatoform disorder, which caused mild limitations in his activities of daily living

and a mild limitation in his ability to function socially. [T. 29].   The medical

consultants also concluded that those impairments resulted in moderate limitations in

the Plaintiff's ability to maintain concentration, persistence, and pace, and had never

resulted in an episode of decompensation of extended duration.  Id.  In addition to the

PRTF, the medical consultants also completed a Mental Residual Functional Capacity

Assessment ("MRFCA"), on August 19, 2003, in which they determined that the

Plaintiff had moderate limitations in his ability to understand, remember, and carry out

detailed instructions, to maintain attention and concentration for extended periods, to

work in coordination with, or proximity to, others without being distracted by them, and to interact appropriately with the general public.  Id.

The medical consultants also found that the Plaintiff reported, on his ADL form, that he had close friends, and was able to perform household chores, including cleaning, cooking, and shopping, as well as exercise on a regular basis, which contributed to their opinion that he was able to carry out routine, repetitive tasks with adequate persistence and pace, was capable of engaging in brief and superficial contact with the general public, and could function with the ordinary level of supervision generally found in customary work settings.  Id.  Finally, the medical consultants concluded that the Plaintiff was capable of handling stress commonly found in routine, repetitive-type work settings.  Id.  The ALJ noted that he was not bound by the conclusions set forth in the medical consultants reports, but that, after considering the Record in its entirety, he found that their conclusions were supported by the Record as a whole.  Id.

After considering the entire Record, including the testimony adduced at the Hearing, the opinions of the Plaintiff's treating physicians, the reports of the State Agency consultants, the objective medical evidence, and the Plaintiff's subjective complaints of pain, the ALJ adopted, as the Plaintiff's RFC, the same limitations that

were listed by the State Agency medical consultants in the MRFCA, and PRTF, of August 19, 2003, and November 24, 2002, respectively.  Id.  In addition, the ALJ found that the Plaintiff had environmental limitations, and therefore, should avoid working around moving machinery, or at dangerous heights.  Id.

Proceeding to the Fourth Step, the ALJ concluded that the Plaintiff could not perform any of his past relevant work, as a bowling alley manager or motorcycle mechanic, as those positions were skilled in nature, or as a security guard or cook, as those were semi-skilled positions.  Id.  The ALJ noted that the Plaintiff's RFC limited him to simple, repetitive tasks, and while the Plaintiff had past work as a convenience store clerk, the ALJ was unable to determine that, based on the Record, that position constituted substantial gainful activity.

Accordingly, at Step Five the ALJ noted that the final step was to determine whether there were other jobs, existing in significant numbers in the national economy, that the Plaintiff could perform given his RFC, age, education, and work experience.  Id.  The ALJ expressly noted that the burden of proof shifts, at this Step, to the Commissioner.  Id.  The ALJ reported the findings of the VE that a younger individual, with a high school education, and suffering from the limitations outlined by the State Agency medical consultants in the MRFCA included in the Record, could

work as a convenience store clerk, mail clerk, motel cleaner, or hand packager.  [T.

30-31].   The ALJ then asked the VE to assume that the hypothetical individual

required seizure precautions, and the VE removed hand packer from the list of

possible occupations.  Id.  The VE testified that the occupations that he outlined were

light in exertion level, unskilled in nature, and did not involve seizure precautions.

Id.  The VE stated that in the national economy there were approximately 400,000

convenience store clerk positions, 51,000 mail clerk positions, and 400,000 motel

cleaner positions.  Id.  The ALJ concluded that the Plaintiff was capable of performing

other jobs existing in significant numbers in the national economy between May 21,

2002, and August of 2004, and was not disabled at any time during that period.  Id.


IV.  Discussion

A.  Standard of Review.  The Commissioner's decision must be affirmed if

it conforms to the law and is supported by substantial evidence on the Record as a

whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413

F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002);

Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more

than a mere search for the existence of evidence supporting the Commissioner's

decision.  See, <u>Morse v. Shalala</u>, 32 F.3d 1228, 1229 (8th Cir. 1994), citing <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, <u>Cox v. Apfel</u>, 160 F.3d 1203, 1206 (8th Cir. 1998); <u>Moore ex rel. Moore v. Barnhart</u>, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, <u>Loving v. Secretary of Health and Human Services</u>, 16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the

Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).

Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions

from the evidence and one of those positions represents the Commissioner's findings,

we must affirm the denial of benefits.'" Vandenboom v. Barnhart, 412 F.3d 924, 927

(8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004);

Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82

F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the

Commissioner even if this Court, sitting as the finder-of-fact, would have reached a

contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v.

Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of

drawing two inconsistent conclusions, and therefore, embodies a "zone of choice,"

within which the Commissioner may decide to grant or deny benefits without being

subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir.

2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley

v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial

evidence in the record to support the Commissioner's decision, we will not reverse it

simply because substantial evidence exists in the record that would have supported a

different outcome, <u>Shannon v. Chater</u>, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record <u>de novo</u>.  See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v. Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

   B. <u>Legal Analysis</u>.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

   1. That the ALJ Failed to Give Substantial Weight to the Plaintiff's Treating Physicians;

   2. That the ALJ Disregarded the Opinions of the State Agency Medical Consultants;

   3. That the ALJ Ignored Lay Statements without Refuting Their Credibility;

   4. That the ALJ Failed to Develop the Record, and Relied on Evidence Not In the Record; and

   5. That the Hypothetical to the VE Did Not Include All of the Limitations Supported by the Record.

See, <u>Plaintiff's Memorandum</u>, <u>Docket No. 8</u>.

We have extensively detailed the Record before us and we find that the separately stated issues, as they have been framed by the Plaintiff, conflate to a core question -- namely, whether the ALJ adequately developed the Record. We find that he did not, and therefore, we recommend a reversal and remand.[9]

Standard of Review. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004); see also, Cunningham v. Apfel, 222 F.3d 496, 502 n. 6 (8th Cir. 2000)("An ALJ has th[e] well established duty to develop a full and fair record because the hearing is non-adversarial -- the goals of the Commissioner and the advocates should be the same: that deserving claimants who apply for benefits receive justice.") . The duty of the

---

[9]Counsel for the Plaintiff is reminded, that reasoned discourse is not advanced by a resort to personal invective, or by ad hominem attacks. Given their different roles, it can be expected that a claimant's attorney will differ, on appeal, with the reasoning, as well as the decision, of an ALJ. However, on this Record, there is no responsible basis to label, as the Plaintiff's counsel does, the ALJ as being "ignorant," "prejudice[d]," or "biased," and we find those epithets dismaying. See, Plaintiff's Memorandum, Docket No. 8, at pp. 2, 10; Plaintiff's Response, Docket No. 12, at p. 3.. Such unbridled advocacy is not only unprofessional, it is unnecessarily demeaning to the ALJ, to counsel, and to counsel's client, and it detracts from the legitimacy, and the persuasive force, of the Plaintiff's other arguments.

ALJ is applicable, even where, as here, an individual is represented by counsel. See, Weber v. Barnhart, 348 F.3d 723, 725 (8th Cir. 2003), citing Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992).

However, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). "'[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" Warburton v. Apfel, 188 F.3d 1047, 1051 (8th Cir. 1999), quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994). When faced with an objection, that the ALJ has failed to properly develop the Record, the Court's inquiry must focus on "whether [the Plaintiff] was prejudiced or treated unfairly by how the ALJ did or did not develop the record" and, "absent unfairness or prejudice, we will not remand." Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993); Phelan v. Bowen, 846 F.2d 478, 481 (8th Cir. 1988).

B.     Legal Analysis.  The parties take the polar ends of a common question. The Plaintiff contends that the ALJ erred by not granting the opinions of his treating physicians controlling weight. See, Plaintiff's Memorandum, Docket No. 8, at pp. 4-

7, 8-11.  He asserts, and the Commissioner concedes, that such medical sources have a close relationship with their patients, are well-qualified, and have spent considerable time in his treatment and care.  <u>Id.</u>  The Commissioner responds that treating physicians, as a result of the close, personal relationship that they maintain with their patients, can be partial to the patients' demands, inclusive of doing "favors" in support of their patient's claim for Social Security benefits.  See, <u>Defendant's Memorandum, Docket No. 10</u>, p. 25.  In addition, the Commissioner underscores that an ALJ has no obligation to afford greater weight, much less controlling weight, to the conclusions of treating physicians which are not supported by the Record as a whole.  <u>Id.</u> at p. 24, quoting <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1177 (7th Cir. 2001).  Both positions have more than passing merit.

As the Supreme Court observed, albeit in the context of an ERISA disability plan:

> As compared to consultants retained by a plan, it may be true that treating physicians, as a rule, "ha[ve] a greater opportunity to know and observe the patient as an individual." [Regula v. Delta Family-Care Disability Survivorship Plan, 266 F.3d 1130, 1139 (9th Cir. 2001)](internal quotation marks and citation omitted).  Nor do we question the Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an "incentive to make a finding of 'not disabled' in order to

- 70 -

> save their employers money and to preserve their own
> consulting arrangements." Id., at 1143. But the assumption
> that the opinions of a treating physician warrant greater
> credit than the opinions of plan consultants may make scant
> sense when, for example, the relationship between the
> claimant and the treating physician has been of short
> duration, or when a specialist engaged by the plan has
> expertise the treating physician lacks. And if a consultant
> engaged by a plan may have an "incentive" to make a
> finding of "not disabled," so a treating physician, in a close
> case, may favor a finding of "disabled."

The Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2003).

In contrast to ERISA, "[t]he Social Security Administration, the regulations inform, will generally 'give more weight to opinions from * * * treating sources,' and 'will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.'"  Id. at 829, citing 20 C.F.R. §§404.1527(d), 416.927(d)(2).

Here, the ALJ closely parsed the medical records, and specifically assessed the physical and psychological test results, and the medical opinions of the Plaintiff's treating sources, as well as those of consulting sources. Indeed, the Plaintiff does not complain that the ALJ overlooked any such opinions -- in fact, he has criticized the ALJ for considering a clinical observation, provided by Dr. Sullivan, upon which Drs. Randa and Doss relied. See, Plaintiff's Memorandum, Docket No. 8, at p. 7; [T. 24,

162, 184].  Rather, the Plaintiff objects to the ALJ's refusal to provide those opinions

controlling weight.  The ALJ explained the basis for that refusal, in part, as follows:

> The undersigned has considered all of the medical
> professional's opinions in the record; however, he must
> point out that, given the lack of any significant clinical
> findings, these opinions appear to be based on claimant's
> subjective complaints which, for the reasons to be outlined
> below, the undersigned cannot find to be entirely credible.
> As such, the undersigned cannot place significant weight to
> these opinions.  Moreover, the undersigned must point out
> that the issue of "disability" is one which is reserved for the
> Social Security Commissioner (Social Security Ruling 96-
> 5).

[T. 23].

Thereafter in seven (7) pages of his decision, the ALJ scrutinizes the observations and

opinions of the medical sources, and reiterates his reasons for giving those opinions

less than significant weight.  [T. 23-29, and 28].

We find no error in the ALJ's refusal to accord the opinions of the Plaintiff's

treating physicians controlling weight.   Without exception, those opinions are

conclusory, in that the opinions expressed are neither explained, nor substantiated by

the slightest shred of medical, or psychological reasoning.  As the Court explained,

in Stormo v. Barnhart, supra at 805-06:

> The opinions of the claimant's treating physicians are
> entitled to controlling weight if they are supported by and

> not inconsistent with the substantial medical evidence in the
> record. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).
> Merely concluding that a particular physician is a treating
> physician, therefore, is not the end of the inquiry. Such
> opinions are given less weight if they are inconsistent with
> the record as a whole or if the conclusions consist of vague,
> conclusory statements unsupported by medically acceptable
> data. Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996).
> For example, treating physicians' opinions are not medical
> opinions that should be credited when they simply state that
> a claimant can not be gainfully employed, because they are
> merely "opinions on the application of the statute, a task
> assigned solely to the discretion of the [Commissioner]."
> Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir.
> 2002)(citation omitted)(alteration in original).

See also, Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)("A medical source
opinion that an applicant is 'disabled' or 'unable to work,' however, involves an issue
reserved for the Commissioner and therefore is not the type of 'medical opinion' to
which th Commissioner gives controlling weight."); Holmstrom v. Massanari, 270
F.3d 715, 720-21 (8th Cir. 2001)("A treating physician's opinion deserves no greater
respect than any other physician's opinion when [it] consists of nothing more than
vague, conclusory statements."), quoting Piepgras v. Chater, supra at 236 (8th Cir.
1996).

The Plaintiff's treating physicians, in closely analogous, and wholly conclusory terms,

opined that the Plaintiff was disabled, and was credible. [T. 303-311]. The ALJ was

plainly not bound by their conclusions on disability, nor was he required to defer to

their assessments of credibility, especially when he did not share that assessment for

validly stated reasons. See, Holmstrom v. Massanari, supra at 721 ("The credibility

of a claimant's subjective testimony is primarily for the ALJ to decide, not the

courts."), citing <u>Benskin v. Bowen</u>, 830 F.2d 878, 882 (8th Cir.1987); see also, <u>Dukes v. Barnhart</u>, 436 F.3d 923, 928 (8th Cir. 2006)("Where adequately explained and supported, "credibility findings are for the ALJ to make."), quoting <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000); <u>Cox v. Barnhart</u>, 471 F.3d 902, 907 (8th Cir. 2006)("Because the ALJ was in a better position to evaluate credibility, we defer to his credibility determinations as long as they were supported by good reasons and substantial evidence."), citing <u>Guilliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).

Here, several of the Plaintiff's treating physicians submitted the equivalent of a checklist, [T. 303-311], which were extremely conclusory, and none of the experts explained, nor even attempted to explain, the inconsistencies in the Plaintiff's psychological test results, which led to alternative diagnoses of "'spells of undetermined etiology,' 'post concussive syndrome,' 'episodic loss of consciousness, etiology unclear,' 'atypical seizures,' 'seizures disorder,' 'pseudoseizures,' 'non-epileptic events,' and 'conversion disorder vs. malingering vs. factitious disorder.'"[10]

_____

[10]As the Court explained, in <u>Boiles v. Barnhart</u>, 395 F.3d 421, 422 (7th Cir. 2005)("Pseudoseizures, also known as psychogenic seizures, nonepileptic seizures, and paraoxysmal nonepileptic episodes (PNES), resemble epileptic seizures but are not attributable to epilepsy or abnormal electric activity in the brain," Ronald P. Lesser, "Treatment and Outcome of Psychogenic Nonepileptic Seizures," <u>Epileptic</u>

[T. 24]; see, <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 720-21 (8th Cir. 2001)(rejecting treating physicians' opinions "because they were in checklist form," were based on relatively short-term relationships, and were inconsistent with other substantial evidence in the Record; cf., <u>Cain v. Barnhart</u>, 197 Fed.Appx. 531, 533 (8th Cir. 2006) ("A treating physician's checkmarks on a[] [medical source statement] form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record.").   On this Record, we cannot determine, with confidence, whether the Plaintiff suffered from a mental disability, which effectively incapacitated him from substantial gainful activity, or whether he had a "hidden agenda," [T. 27], or "maintained a sick role for financial reasons."  [T. 22].  Such a determination, in the form of a competent RFC, is crucial to an award of DIB.

---

<u>Currents</u>, Nov. 2003, at p. 198, and "[n]o single cause of psychogenic seizures has been identified, but they are typically attributed to an underlying psychological disturbance. Id."). Here, the Plaintiff "underwent a number of evaluations, including neurological evaluations, neuropsychological evaluations, EEGs (electroencephalograms), CT scans, laboratory studies, magnetic resonance imaging (MRI) brain scans, and a lumbar puncture," and "[t]he record reveals that these studies had been negative for significant pathology." [T. 24]. Despite such clinical workups, the experts, inclusive of the Plaintiff's treating physicians and psychologists, failed to harmonize, or otherwise explain, the anomalous clinical results which conflicted with the Plaintiff's subjective complaints, so as to differentiate between the existence of a debilitating mental illness, and a transient aversion to work because of the financial gains in not doing so.

Although the ALJ placed great weight on the Agency consultants, their reports are also devoid of any critical assessment of the discrepancies in this Record, and they are silent on appraising the contradictory psychological test results. As a consequence, the medical evidence in this Record suffers from a significant, and we think, a crucial void -- namely, whether the Plaintiff's complaints of a somatoform disorder[11] are real, or feigned. Where, as here, a critical issue has gone undeveloped, the Courts have directed the Commissioner to fill that gap with competent evidence. As expressed in Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001):

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," Singh [v. Apfel], 222 F.3d [448], 451 [(8th Cir. 2000). "[S]ome medical evidence," Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000)(per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function

---

[11]As we have noted, "[a] somatoform disorder involves '[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.'" Jones v. Callahan, 122 F.3d 1148, 1152 n. 4 (8th Cir. 1997), quoting 20 C.F.R. pt. 404 supt. P app. 1 pt. A §12.07 (1997). The Plaintiff accuses the ALJ of failing to recognize the disorder, but a simple reading of the ALJ's decision plainly disproves that accusation. See, e.g., T. 29 (recognizing that the Agency medical consultants opined that the Plaintiff "had an affective disorder and a somatoform disorder * * *.").

in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Therefore, although in evaluating [the claimant's] RFC, see 20 C.F.R. §404.1545(c), the ALJ was not limited to considering medical evidence, we believe that the ALJ was required to consider at least some supporting evidence from a professional.

The reasoning in Lauer is particularly germane, and persuasive, for there, the Court was confronting a somatoform disorder, as did the ALJ here. The holding in Lauer has been faithfully observed. See, Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001)("To properly determine a claimant's residual functional capacity, an ALJ is therefore 'required to consider at least some supporting evidence from a [medical] professional.'"), quoting Lauer v. Apfel, supra at 704; Krogmeier v. Barnhart, 294 F.3d 1019, 1023-34 (8th Cir. 2002); Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002); Vester v. Barnhart, 416 F.3d 886, 891 (8th Cir. 2005).

We are mindful of the Commissioner's argument, that the ALJ's RFC was predicated on the consulting medical experts of the Agency, [T. 234-38] and [T. 239-52], but we have already concluded that those reports are as conclusory as those of the Plaintiff's treating physicians and, since the Agency's consultants did not examine the Plaintiff, their assessments are insufficient to satisfy the ALJ's burden to fully develop

the Record.   See, Lauer v. Apfel, supra at 705-06 (conclusory opinion of the State

Agency's consultant, who did not examine the claimant, did not constitute substantial

evidence to support the ALJ's RFC finding); Bowman v. Barnhart, supra at 1085

("Instead of developing the record from [the claimant's treating physician], in

assessing [the claimant's] residual functional capacity, the ALJ improperly relied on

the report of a state consultant, who did not examine [the claimant]."); Dixon v.

Barnhart, supra at 100203 (rejecting ALJ's reliance on State Agency's consultant, who

never examined the claimant, since that reliance did "not constitute substantial record

evidence that [the claimant] can perform medium work.").   Without the requisite

medical opinion to support its legitimacy, we conclude that the ALJ's RFC was not

properly informed, and therefore, must be rejected.

Nor do we ignore the Commissioner's contention that, in any event, the

evidence in the medical records, that was provided by the personal observations of the

Plaintiff's lay witnesses, and that was elicited from the Plaintiff, did not establish that

the number of non-epileptic episodes was sufficiently large as to impede the Plaintiff's

capacity to engage in substantial gainful activities.   See, Defendant's Memorandum,

Docket No. 10, at p. 29.   Our Court of Appeals has recognized, however, that a

somatoform disorder "can in itself be a disabling impairment."   Lauer v. Apfel, supra

at 705, citing Easter v. Bowen, 867 F.2d 1128, 1130 (8th Cir. 1989).  As is the case

with most impairments, physical or mental, the question is the degree of incapacitation

that the impairment causes.  Without competent medical evidence on the impact of the

Plaintiff's mental impairment, the ALJ's inference as to that impairment's impact is

necessarily unsubstantiated, and therefore, "it cannot stand."  Hutsell v. Massanari,

supra at 712.  "Absent that [medical] information, it is not possible to ascertain [the

Plaintiff's] ability to work without engaging in conjecture."  Dixon v. Barnhart, supra

at 1002, citing Nevland v. Apfel, 204 F.3d 853 858 (2000)("'An administrative law

judge may not draw upon his own inferences from medical reports.'"), quoting Lund

v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975); see also, Nevland v. Apfel, supra at

858.

As our Court of Appeals has observed, when facing the same circumstance,

"[i]n our opinion, the ALJ should have sought such an opinion from [the Plaintiff's]

treating physicians or, in the alternative, ordered consultative evaluations to assess

[the Plaintiff's] mental and physical residual capacity."  Nevland v. Apfel, supra at

858.  Here, however, the ALJ made no focused inquiry to the Plaintiff's treating

physicians nor, ironically, did he consult with the neutral Medical Expert, Dr. Michael

J. McGrath, [T. 67-71], who was retained by the Commissioner for that purpose, and

who attended the Administrative Hearing to present expert opinion evidence. [T. 72]. Apparently, Dr. McGrath arrived at the Hearing late, and the ALJ decided not to ask him any questions. [T. 388]("Considering Dr. McGrath arrived late and there's a bunch of new exhibits, I don't believe that I will ask him any questions."). Unfortunately, in foregoing the expert opinion testimony of Dr. McGrath, the ALJ contributed to the undeveloped state of the Record which now requires a remand.

On remand, we believe that the ALJ should direct focused inquiry to the Plaintiff's treating physicians as to how the Plaintiff's mental impairment affected his capacity to engage in substantial gainful activity, and to address the psychological test results that appeared to suggest, to some of the medical examiners, that the Plaintiff could be a malingerer, given the financial reward in doing so; should order consultative examinations; should consult with a neutral Medical Expert; or should employ some combination of those means of assuring a properly developed Record. We make plain that, in recommending a remand, we do not intimate, however slightly, what ultimately should be the ALJ's ruling on the merits of the Plaintiff's application for benefits. The Record is far too undeveloped to hazard a guess on that subject, even if we were inclined and empowered to do so, which we are not.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That the Plaintiff's Motion [Docket No. 7] for Summary Judgment be denied.

2.     That the Defendant's Motion [Docket No. 9] for Summary Judgment be denied.

3.     That this matter be remanded to the Commissioner for further proceedings in accordance with this Report.

4.     That, pursuant to the holding in <u>Shalala v. Schaefer,</u> 509 U.S. 292 (1993), Judgment be entered accordingly.


Dated: January 29, 2007                    s/Raymond L. Erickson
                                           Raymond L. Erickson
                                           CHIEF U.S. MAGISTRATE JUDGE


**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **February 15, 2007**, a writing which specifically identifies those portions of the

Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **February 15, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.